IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 21–32–M–DWM |
| Plaintiff/Respondent, | |
| vs. | ORDER |
| KATHY ANN HENDRICKSON, aka *Kathy Thorberg*, | |
| Defendant/Movant. | |

On July 28, 2021, a grand jury indicted Defendant/Movant Kathy Ann Hendrickson with cyberstalking in violation of 18 U.S.C. § 2261A(2)(B). (Doc. 1.) She was convicted in February 2022, after a three-day jury trial, (*see* Doc. 63), and in May 2022, she was sentenced to 52 months of custody with three years of supervised release to follow, (*see* Doc. 77). In August 2023, her conviction was affirmed on appeal. (Docs. 90, 91.) Hendrickson now seeks federal habeas relief under 28 U.S.C. § 2255. (Docs. 93, 113.) For the reasons provided below, her motion is denied.[1]

---

[1] Because Hendrickson's motion can be conclusively decided on the existing record, an evidentiary hearing is not necessary. *See Blackledge v. Allison*, 431 U.S. 63, 76 (1977); *United States v. Mejia-Mesa*, 153 F.3d 925, 929 (9th Cir. 1998).

1

## BACKGROUND[2]

### I.     Trial

A three-day jury trial was held in February 2022. (*See* Docs. 87–89 (transcripts), 63 (verdict).) The government called 12 lay witnesses and three law enforcement officers. (*See* Doc. 64; *see also* Doc. 65 (trial exhibits).) The defense called one lay witness. The government's case and the defense's theory are outlined below.

#### A.     The Case Against Hendrickson

In 2016 or 2017, Hendrickson met the victim on an internet dating website. Tr. 232, 522. Hendrickson lived in Walla Walla, Washington and the victim lived in Trout Creek, Montana. Tr. 228, 233–34. Prior to meeting in person, Hendrickson and the victim communicating electronically and over the phone for several months. Tr. 233, 522. Hendrickson ultimately traveled to Montana to visit him a handful of times over the course of eighteen months, generally coming over for the weekend. Tr. 233–34, 522, 579. However, the victim never visited Hendrickson in Washington, Tr. 234, 526, and their relationship was not exclusive, *see* Tr. 235, 262, 302–03, 548. Hendrickson and the victim's relationship ended in July 2018, after one of Hendrickson's visits to Montana. Tr. 237, 311–12.

---

[2] The trial transcript is cited as "(Tr. [page no.].)"

The harassment underlying the present case took two primary forms. First, when the victim and Hendrickson were still dating, in approximately December 2017, the victim began receiving harassing phone calls, texts, and emails. Tr. 238–39, 248. The emails began in earnest in May 2018, and were from an anonymous email account, appleshines1@gmail.com. Tr. 238–39, 264; (*see* Doc. 65-22). Those emails contained threats against him and referenced his home and property, implying that the sender had been on the property or even inside his house. Tr. 264–65, 266, 269–70, 273; (Doc. 65-22 at 13, 29, 30). The messages from the appleshines1 account also sometimes contained information either referencing the victim's relationships with other women or attempting to make it seem as though the messages came from those women, specifically the victim's former girlfriend Ruby. *See* Tr. 268–69, 272–78, 320.

Second, after their relationship ended, the victim's email account was hacked. The hacker sent messages, purportedly from the victim, threatening several individuals, including two Sanders County Commissioners and the receptionist for the Sanders County Commission. Tr. 243–45, 351–52; (Docs. 65-1, 65-2, 65-3). The hacker also used the victim's email address to send a threat to Montana's then-Governor, Steve Bullock. Tr. 280–81, 383–88. Hendrickson herself also received threatening emails from the victim's account, which she provided to the Sanders County Sheriff's Office in the hopes of getting him in

trouble. Tr. 281–86, 368–76; (Docs. 65-25, 65-26). This harassment caused the victim a lot of stress, Tr. 241, 325, 338–39, and he spent months trying to determine how his account was being hacked, including contacting his telephone and internet service provider and having a local computer repair person attempt to fix both his email and his computer. Tr. 242, 329–39, 428.

Investigators ultimately connected Hendrickson to the threatening emails through Hendrickson's primary cell phone and a prepaid, burner cell phone. *See* Tr. 475, 481. Images recovered from Hendrickson's primary cell phone were included as attachments in the appleshines1 emails or referenced in the messages. *See* Tr. 246, 267–68, 271–72; (Docs. 65-21 at 7, 41, 65-22 at 24, 36–37). Hendrickson's primary phone also contained photographs of handwritten login and password information from the victim's house, Tr. 250–63; (*see* Doc. 65-21), as well as apps that could be used to obscure the user's phone number, *see* Tr. 484.

Additionally, the appleshine1 email account identified the subscriber as having a particular burner phone number and was registered with Google on March 13, 2018, the same day that burner phone was activated. Tr. 476, 479; (Docs. 65-12, 65-13, 65-14, 65-17). The burner phone itself was linked to Hendrickson in three different ways. First, she used it to call the FBI and the U.S. Attorney's Office in Washington after her primary phone was seized. Tr. 581–82, 586; (Doc. 65-16 at 3). Second, Hendrickson used the burner phone to communicate with a

4

man in Oregon who she also texted from her primary phone. Tr. 493–94, 590–91; (*compare* Doc. 65-15 (burner texts) *with* Doc. 65-32 (primary phone texts)). Finally, the burner phone was used to make anonymous calls to numbers found on the victim's caller ID on his landline, which Hendrickson had used her primary phone to photograph. Tr. 591–94; (*see* Doc. 65-21 at 24). The burner phone was also connected to a Verizon IP address in Washington around the times the victim's email account was hacked. Tr. 466–71; (Doc. 65-9).

According to the government, Hendrickson's conduct was motivated by jealously and anger. First, she harassed the victim while they were together because she wanted their relationship to be more serious and was jealous of the other women he was seeing. And second, after their relationship ended, she sought to get the victim in trouble by using his email address to send threatening messages to people. The government conceded, however, that there was no direct evidence that Hendrickson either sent the appleshines1 emails or sent threatening messages from the victim's email account. *See* Tr. 492. Thus, the government recognized that this case came down to whether they adequately connected the digital evidence to Hendrickson. *See* Tr. 686 ("The only question for you is: How do you know that it's Ms. Hendrickson? That's really the one question for you to answer when you engage in your deliberations."). To counter the idea that Hendrickson was mistakenly identified, the government presented evidence that Hendrickson

5

had previously been convicted of similar conduct in 2006, Tr. 595–96 (Doc. 65-28), and 2008, Tr. 597–98 (Doc. 65-29), wherein she harassed male victims she met online after the relationship ended. *See also* Tr. 624–32 (previous victim testimony); Tr. 633–46 (same). And, notably, after Hendrickson's primary phone was seized in February 2019, there were no more threats from the appleshines1 email or hacking of the victim's email.

## B. The Defense Theory

At trial, Hendrickson argued that someone else stalked and harassed the victim. Hendrickson emphasized that the government could only circumstantially connect her to the burner phone, the appleshines1 account, or the hacking of the victim's email and that the victim himself actually suspected other women of being the culprit. *See* Tr. 269, 341, 396. To this end, the defense called a single fact witness, Mark Zechmeister, to emphasize that Hendrickson did not stalk all the men she met online. *See* Tr. 658–67.

During his opening at trial, defense counsel emphasized how the government's investigation focused on only one suspect, Hendrickson, and did not consider who else may have been responsible for the threats and the hacking despite the numerous other women the victim communicated with online and brought to Trout Creek. Tr. 220, 223. Defense counsel also forecast that the

government would not be able to directly link Hendrickson to either the appleshines1 email account or the burner phone. Tr. 223–24.

Consistently, during trial, defense counsel planted the seed that there were other suspects. Defense counsel got the victim to concede that other women had access to his home and personal information, Tr. 304–05, and that the victim initially believed the person harassing him was his former girlfriend Ruby, Tr. 306, 309; *see also* Tr. 396. Notably, defense counsel pointed out that the threatening emails from the appleshines1 account stopped after the victim reconnected with Ruby, Tr. 321, and Ruby knew he kept passwords in a book at his house, helped him set up a Gmail account, and sometimes called his telephone provider to listen to his voicemails, Tr. 414–17. Defense counsel also cast doubt on Hendrickson's ability to hack the victim, emphasizing that the victim changed all his logins and passwords after July 2018, the last time Hendrickson visited him, and his new passwords were completely random. Tr. 319, 342. However, he continued to be hacked. Tr. 344; *see* Tr. 347 (indicating that the technician believed someone was contacting his internet provider to get updated login information). Further, defense counsel cast doubt on Hendrickson's purported motive, as the victim began receiving the threatening messages while he and Hendrickson were still seeing one another. *See* Tr. 308, 309; *see also* Tr. 645–46. Defense counsel also elicited testimony that the witnesses could not directly place Hendrickson—as opposed to

7

another individual—in front of the computer, see Tr. 354, 359, 366, 389–90; see also Tr. 492, and that their investigation was focused on Hendrickson from the beginning, Tr. 598. And in her case-in-chief, defense counsel laid the groundwork through Zechmeister, another man Hendrickson met online, that she had relationships with men that did not end in harassment. See Tr. 658–66.

Finally, in closing, defense counsel once again highlighted the fact that other women had access to the victim's home and personal information, the victim initially thought his ex-girlfriend Ruby was the harasser, the harassment started while the victim and Hendrickson were still together, the victim changed his login information after July 2018, and, maybe most importantly, the burner phone was never found in Hendrickson's possession. Tr. 711–18. As a result, defense counsel posited that the government had not proven its case beyond a reasonable doubt. See Tr. 719.

## II. The Verdict, Sentencing, and Appeal

Hendrickson was ultimately convicted, (Doc. 63), and on May 26, 2022, she was sentenced to 52 months of custody with three years of supervision to follow, (Doc. 77). Hendrickson timely appealed her conviction based on the admission of the "prior acts" evidence. (Doc. 80.) In August 2023, Hendrickson's conviction was affirmed in an unpublished memorandum disposition. (Docs. 90, 91.)

## III. Current Motion

On October 10, 2023, Hendrickson filed a pro se motion to vacate under 28 U.S.C. § 2255. (Doc. 93.) Counsel was appointed, (Doc. 111), and an amended § 2255 motion was filed on July 9, 2024, (Doc. 113). In her amended motion, Hendrickson argues defense counsel was inadequate in two ways: (1) failing to investigate or subpoena her coworkers to show she was not on her phone when threatening emails were sent and (2) failing to call her to testify in her own defense.[3] (*See id.*) In support of that motion, Hendrickson filed four affidavits, one from Hendrickson herself, (Doc. 113-1), and three from her coworkers, (Docs. 113-2, 113-3, 113-4).

On September 11, 2024, the government responded, (Doc. 117), and attached affidavits from trial defense counsel Michael Sherwood, (Doc. 117-1), and Matthew McKeon, (Doc. 117-2). According to those affidavits, trial counsel spoke to the witnesses identified by Hendrickson prior to trial, and they thoroughly discussed with Hendrickson whether she would testify, including holding a mock cross-examination the night before the government rested. (*See* Docs. 117-1, 117-

---

[3] Hendrickson's original pro se motion contained the following five claims: (1) defense counsel did not give her adequate time to review discovery; (2) defense counsel failed to present evidence of her work schedule to prove she was at work without her phone at the time the threatening emails were sent; (3) defense counsel refused to subpoena her coworkers to that same effect; (4) defense counsel failed to get the victim mentally evaluated; and (5) defense counsel failed to present messages between Hendrickson and Ruby showing that the victim had extreme outbursts caused by his drug use. (*See* Doc. 93.)

9

2.) On October 1, 2024, Hendrickson filed her reply, (Doc. 119), attaching an additional statement[4] by Hendrickson's daughter, who avers that she was with Hendrickson for the attorney meeting during the trial and there was no mock cross-examination, (Doc. 119-1).

## ANALYSIS

The Sixth Amendment guarantees the right of effective assistance of counsel at all critical stages of a criminal proceeding. *See United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997). To prevail on an ineffective assistance of counsel claim, a petition must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). That is, the petition must show not only that there was a deficiency, but that the deficiency was prejudicial. *Id.* at 692. "[I]t is unnecessary to consider the prejudice prong of *Strickland* if the petition cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable

---

[4] *But see* 28 U.S.C. § 1746 (requiring specific language for unsworn declarations).

professional judgment." *Id.* at 690. To wit, the Supreme Court has cautioned that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

As mentioned above, Hendrickson alleges counsel was ineffective on two grounds: failing to adequately investigate or call witnesses that bore on Hendrickson's phone use and failing to call her to testify on her own behalf. These claims are discussed in turn.

I.  **Failure to Investigate or Call Witnesses**

Hendrickson first argues that trial counsel was ineffective for failing to investigate or call any of her coworkers to testify at trial to show Hendrickson could not have been using either her primary phone or the burner phone when the threatening messages were sent. This claim lacks merit.

"A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) (internal quotation marks and alteration omitted). Nevertheless, "strategic choices made after thorough investigation of law and facts relevant to plausible

11

options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "A disagreement with counsel's tactical decision does not provide the basis for declaring that the representation was constitutionally deficient." *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006).

Here, prior to trial, counsel asked Hendrickson if there were any witnesses she thought may bear on the case. (*See* Doc. 117-1 at 5.) In response, she identified three people: Jodie McNeil, Jerrod Burton, and Mark Zechmeister. (*Id.*) Counsel contacted all three. Counsel determined that while McNeil, Hendrickson's supervisor at the Dollar Tree, could testify to the store's cellphone policy, she could not confirm that Hendrickson did not use her phone during her free time, she was emotional about her own son's experience with cyberstalking, and she thought Hendrickson was "kind of a bitch." (*Id.* at 6.) Based on this information, counsel decided not to call McNeil at trial. (*Id.* at 7.) Counsel also spoke to Jerrod Burton, who barely remembered working with Hendrickson many years before at Walmart, and Burton indicated that he knew nothing and did not want to testify. (*Id.*) Thus, counsel also chose not to call him as a trial witness. (*Id.*) Finally, counsel spoke with Zechmeister, and as discussed above, he was called as a trial witness. (*Id.* at 7–8.) Counsel also received an email from a "Esperanza Castaneda" stating that she knew Hendrickson and Hendrickson could not have used her phone at work, but Ms. Castaneda did not respond to any further

12

inquiries from counsel. (*Id.* at 6.) Counsel then asked Hendrickson if there was anyone else she thought he should contact, and she did not identify any further witnesses. (*Id.* at 8.)

Notably, Hendrickson did not provide counsel with the names of her coworkers—Velma Sargent and Rose Elmore—whose affidavits are presented here. (Docs. 113-3, 113-4.) The fact counsel did not independently identify those individuals was not ineffective assistance insofar as "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Strickland*, 466 U.S. at 691. Contrary to Hendrickson's characterization in her reply, defense counsel is not per se ineffective for failing to hire an independent investigator. The relevant inquiry under *Strickland* is whether defense counsel made an informed decision about a witness based on a reasonable investigation. Here, counsel contacted every potential coworker witness identified by Hendrickson and determined that they did not help the defense's narrative of the case. Because the record in this case shows defense counsel performed a reasonable investigation and had strategic reasons for presenting the case as it was presented, counsel's representation did not fall below an objective level of reasonableness. *Strickland*, 466 U.S. at 687–88.

13

Hendrickson's claim also fails under an assessment of prejudice. While her work schedule may have cast doubt on the timing of some messages sent either by the appleshines1 account or through the victim's email account, the threatening emails sent to the County Commissioners were sent on a Sunday evening, (*see* Docs. 65-1, 65-2, 65-3), and the threat to the Governor was sent on a Thursday after 10:00 p.m., (*see* Doc. 65-24). According to Hendrickson herself, she only worked weekdays from 7:00 a.m. to 9:00 p.m. (*See* Doc. 113-1 at ¶¶ 8–10.)

## II. Failure to Call Hendrickson to Testify

Hendrickson further argues that defense counsel was ineffective for not calling her to testify on her own behalf. According to Hendrickson, she "never waivered in her denial of this offense" and "wanted to testify on her own behalf and specifically told her attorney that she wanted to testify." (Doc. 113 at 13.) To be sure, the record supports Hendrickson's contention that, at least at one point, she intended to testify at trial. In an email sent to counsel a month before trial, for example, she stated, "I'll be taking the stand most definitely." (Doc. 117-1 at 48; *see also* Doc. 67 at 1 (pro se letter submitted to Court following her conviction in which she emphasized that she had intended to testify and made her intention clear to counsel).) The record also raises a question whether her counsel actually did a moot cross-examination with her the night before she would have testified. (*Compare* Doc. 117-1 at 10 *and* Doc. 117-2 at 3 *with* Doc. 119-1.) However, the

14

record makes clear that she was counseled on her right to testify and that Hendrickson remained silent when counsel rested the defense's case without calling her as a witness. Courts have consistently held that when a defendant remains silent at trial on the issue of testifying, she cannot later claim ineffective assistance of counsel on this front. *United States v. Edwards*, 897 F.2d 445, 446–47 (9th Cir. 1990) ("[T]o hold that a defendant may abide by his lawyer's advice and not take the stand and then invalidate the trial because he so acted is not fair to the government."); *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993) ("When a defendant is silent in the face of his attorney's decision not call him as a witness, he has waived his right to testify."); *see also United States v. Gerrans*, ___ F.3d ___, 2024 WL 4369650, at *32 (N.D. Cal. Oct. 1, 2024) (collecting cases).

Moreover, Hendrickson presents no information to which she would have testified that would have affected the outcome of the case. As it relates to her work schedule, as indicated above, some of the most damning emails were sent over the weekend, when she was not at work. On the other hand, had she testified, Hendrickson would have potentially opened the door for additional "prior bad acts" evidence. *See Matylinsky v. Budge*, 577 F.3d 1083, 1097–98 (9th Cir. 2009) (finding no prejudice where defendant did not take the stand where doing so would have opened the door to certain prior bad acts evidence and the defendant's personality was inconsistent with the defense strategy).

15

Ultimately, the record shows that Hendrickson and her counsel discussed her putative testimony but that even if she intended to testify over counsel's advice, Hendrickson did not inform the Court of that fact at trial and has not shown on the present petition that her testimony would have impacted the outcome of the case in her favor. Accordingly, this ineffective assistance claim fails as well.

### III. Cumulative Error

Finally, Hendrickson argues that even if one of the issues addressed above is not sufficient to warrant habeas relief, the cumulative error rises to that level. This argument is unpersuasive, however, given the absence of error as discussed above.

### IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Hendrickson's claims fail because counsel's performance neither fell below an objective standard of reasonableness nor caused prejudice. The § 2255

motion involves no open questions of law and no close factual questions. A COA is not warranted.

## CONCLUSION

Based on the foregoing, IT IS ORDERED:

1. Hendrickson's motion to vacate, set aside, or correct her sentence under 28 U.S.C. § 2255 (Docs. 93, 113) is DENIED.

2. A certificate of appealability is DENIED. The clerk shall immediately process the appeal if Hendrickson files a Notice of Appeal.

3. The clerk shall ensure that all pending motions in this case and in CV 23–121–M–DWM are terminated and shall close the civil file by entering judgment in favor of the United States and against Hendrickson.

DATED this 3rd day of December, 2024.

Donald W. Molloy, District Judge
United States District Court